Suffolk, ss.                                          Boston, Massachusetts
                                                      June 7, 2004

### AFFIDAVIT OF SPECIAL AGENT JAMES J. MCCORMACK

**I, Special Agent James J. McCormack, depose and state as follows:**

1. I am a Special Agent of the United States Drug Enforcement Administration ("DEA"). I became a DEA special agent in May 1997 and was assigned to the Providence, Rhode Island Resident Office in January 2001. I have received extensive training in narcotics enforcement and investigations, including 17 weeks of basic training in drug enforcement at the DEA Academy in Quantico, Virginia. I regularly review information on drug trafficking and drug investigation trends distributed by the DOJ El Paso Intelligence Center, the DOJ National Drug Intelligence Center, and DEA headquarters.

2. As a DEA special agent, I have participated in over 100 investigations relating to the possession, manufacture, distribution and importation of controlled substances such as heroin, cocaine, MDMA ("ecstasy"), and marijuana. I also have participated in investigations relating to the financing of drug transactions and the laundering of drug proceeds. Many of these investigations were national or even international in scope, and many required me to work closely with, and to share information and intelligence with, members of other federal, state and local law enforcement agencies. I also have debriefed, and continue to debrief, defendants, informants, and witnesses who have personal

knowledge about narcotics trafficking activities and the operation of narcotics trafficking organizations in Rhode Island, Massachusetts, nationally, and abroad.

3. In the course of my work I have utilized various investigatory tools and techniques, including confidential informants, cooperating witnesses, undercover agents, physical surveillance, search warrants, telephone toll analysis, court-authorized electronic surveillance, grand jury investigations, and witness interviews. I previously have submitted affidavits in conjunction with applications requesting authorization to arrest individuals and to conduct searches and seizures in connection with drug investigations.

4. Based upon my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of narcotics and the collection of money that constitutes the proceeds of narcotics trafficking activities. Among other things, I am familiar with: the manner in which narcotics traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking; the manner in which narcotics traffickers use telephones, coded or slang-filled telephone conversations, pagers, coded pager messages, and other means to facilitate their illegal activities; the vernacular of users and distributors of controlled substances and the methods by which

such persons attempt to disguise the subjects of their conversations and operations; and the typical price, packaging, and method of sale of narcotics in many parts of the country, including eastern Massachusetts.

5. I submit this affidavit in support of a complaint charging JUAN GIRALDO and CLARA VASQUEZ with conspiracy to distribute, and to possess with intent to distribute, 500 grams or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 846, 841(a)(1) & 841(b)(1)(B).

6. The information contained in this affidavit is based on my own observations or has been related to me by law enforcement officers involved in the investigation. This affidavit does not set forth all the facts developed during the course of this investigation. Rather, it sets forth only those facts that I believe are necessary and sufficient to establish probable cause to charge JUAN GIRALDO and CLARA VASQUEZ with violating 21 U.S.C. §§ 846, 841(a)(1) & 841(b)(1)(B).

7. In November 2003, I received information from a paid cooperating witness ("CW") that GIRALDO was selling multi-kilogram quantities of cocaine. I know CW's name and address but I have omitted that information from this Affidavit for CW's safety. The information CW has provided me has always proved reliable and on one occasion led to the seizure of a large quantity of suspected drug proceeds. CW is willing to testify

3

about the matters set forth in this Affidavit.

8.  During March 2004, CW had a number of consensually recorded conversations with GIRALDO about the sale of a kilogram of cocaine. All of CW's consensually recorded conversations with GIRALDO were in Spanish, and many of them have been preliminarily transcribed and preliminarily translated. The quotations below are taken from those preliminary transcripts and translations and may contain minor errors, omissions, or additions.

9.  On March 4, 2004, CW had a consensually recorded conversation in Spanish with GIRALDO in which CW asked about the price of a kilogram of cocaine. Specifically, CW asked GIRALDO, "And how much is that selling for now? At 2-1/2?" (i.e. meaning at $22,500 per kilogram). GIRALDO replied, "No, it's like at . . . like at 23" (i.e. indicating a price of $23,000 per kilogram).

10. On March 7, 2004, CW had another consensually recorded conversation in Spanish with GIRALDO about the sale of cocaine. CW said, "I spoke to this guy," meaning the customer for whom CW wished to purchase the cocaine, "and he told me to wait for him and that it was 15 for each one, each, each kilo, he was going to buy two, but he told me that he only had 30,000 dollars, but he would have the rest of the money tomorrow." CW was here explaining that his cocaine customer wished to purchase two kilograms for an up-front payment of $15,000 per kilogram with the balance to be paid the following the day. GIRALDO said,

"Yeah, but you have to be careful with that man," which CW understood to be a reference to the customer. CW assured GIRALDO, "No. I know who it is," meaning that CW trusted the customer. GIRALDO said, "I can get them for you [i.e. the two kilos of cocaine], but it's a great risk." After additional conversation, GIRALDO explained, "one of my guys, a few days ago got caught around here with 15 kilos."

11. After additional conversation, CW said again, "He [i.e. CW's cocaine customer] called me yesterday and told me that he had only $30,000, to buy two kilos, but he did not have the whole amount of money. He was asking if he could be fronted, on credit. . . . And I said no, that you [i.e. GIRALDO] could not front. . . . So I told him, 'No, when you have the money, then you call me.'" GIRALDO said, "[UI] with you. [UI] but they give it to me at 23." CW understood this to mean that GIRALDO's own suppliers gave him the cocaine at $23,000 per kilogram. CW responded, "That's right. That's why I told him that I would give to him at 24" (i.e. CW told his own customer that he would sell him the cocaine at $24,000 per kilogram). GIRALDO said, "Yeah, you'll make $2,000" (i.e. a profit of $1,000 per kilogram on each of two kilograms). CW said he expected to hear from his customer the following day and would be in touch with GIRALDO.

12. On March 13, 2004, surveillance agents established surveillance outside of 25 Lubec Street in Providence, Rhode Island, which is the residence of GIRALDO's sister, CLARA

5

VASQUEZ. CW, who has a prior relationship with VASQUEZ, was inside the residence. At approximately 11:00 a.m., agents observed GIRALDO arrive at the residence and depart a short time later. CW later told me that GIRALDO had met with CW inside the residence and had told CW that he was going to New York to arrange a shipment of cocaine and would return that night. CW also said that GIRALDO had agreed to provide CW with a kilogram of cocaine after he returned. (This conversation was not tape recorded.)

13. On March 14, 2004, at approximately 9:00 a.m., agents again established surveillance of VASQUEZ's residence. They observed Louis Giraldo, who is believed to be GIRALDO's brother, arrive at the residence. At approximately 12:38 p.m., they observed GIRALDO himself drive to the residence and depart approximately five minutes later. (Although the agents did not actually see GIRALDO enter the residence during this five-minute period, they saw his car parked in the driveway, indicating that he was inside.) At approximately 1:45 p.m., VASQUEZ, who was also inside the residence, asked CW to buy food from a nearby store. CW went to the store and was met there by the agents. CW reported that both GIRALDO and Louis Giraldo had come to the residence earlier and had agreed to sell CW a kilogram of cocaine that day.

14. CW returned to the residence with the food and departed it again approximately 10 minutes later. CW met the agents and

provided them with a kilogram of cocaine. CW said that when he/she had returned to the residence, the kilogram was sitting on the kitchen table; VASQUEZ had pushed the package toward CW and told CW it was all set to go, meaning that CW could deliver it to CW's customer. (As set forth below, VASQUEZ later told CW that after she sent CW out to buy food, Louis Giraldo had gotten the kilogram and dropped it off in the kitchen.)

15. At approximately 2:00 p.m., CW, who was then in Massachusetts, had a consensually recorded telephone call with VASQUEZ. Among other things, CW said to VASQUEZ, "Listen, you have to wait for me a little bit because I have to count the papers, I have to count the money," indicating to her that he was counting the money from the sale of the cocaine. A few minutes later, CW (who was still in Massachusetts) called GIRALDO on his regular cell phone and had a consensually recorded telephone call with GIRALDO. CW said, "Listen to me. . . . I already, already went to the guy to do that errand with him," indicating that he/she had delivered the drugs to the customer. Before CW could say anything further, GIRALDO yelled at him, "Listen, Listen! Why are you calling this telephone, fucker! This is not the fucking phone on the card, fucker! [i.e. referring to a cell phone that utilizes a phone card, which cannot be traced via subscriber information to its owner]. Don't start any of that fucking shit! You know you're not supposed to call me on this phone!" CW said, "Oh fine. I did not know!" GIRALDO said,

7

"Okay, fine. Ciao then!"

16. A few minutes later, CW (who was still in Massachusetts) had another consensually recorded conversation with VASQUEZ. VASQUEZ indicated that GIRALDO was with her. CW said, "Oh, it's because I just called him [i.e. GIRALDO] because the guy [i.e. CW'S customer] has $20,000. And the lady . . . . The girl, his woman comes from Massachusetts, and I need to wait another 20 minutes because she is going to give me the whole amount." CW was here explaining that the customer had paid only $20,000 for the kilogram and CW was waiting for the customer's girlfriend to arrive from Massachusetts with balance owed. VASQUEZ said, "Fine, I agree." CW said, "But that's why I called [i.e. that is why CW had called GIRALDO]! To tell him [i.e. GIRALDO] to wait for me, not to worry." VASQUEZ asked, "And who did you call?" CW replied, "I called JUAN [i.e. GIRALDO] at his phone." VASQUEZ said, "Oh! The very fist thing I told you was . . . Not to call him. . . ! Why didn't you call me! And now I have to hear his fucking tantrum here . . . ! [I told you] not to call him. . . ! Not to call him!" CW said, "Fine. I'm heading to the house right now with the money, anyway."

17. CW was given $24,500 in DEA funds to pay for the cocaine and outfitted with a concealed recording device. ($23,000 was the price of the kilogram and $1,500 was charged by VASQUEZ as her fee for helping to arrange the transaction.) At approximately 3:10 p.m., the agents established surveillance at

8

VASQUEZ's residence. Approximately 10 minutes later, one of the surveillance agents observed Carlos Giraldo, who was operating GIRALDO's Lexus, drive up behind his undercover car, a Mercedes, and appear to take down the license plate number. In view of this apparent counter-surveillance, the agents decided not to equip CW with a concealed recording device. CW was, however, seen entering VASQUEZ's residence with the $24,500, and later reported to me that he/she had given the money to VASQUEZ. CW also said he/she was present that evening when GIRALDO arrived at the residence, went into the bedroom with VASQUEZ, and then told CW that the money was "good," meaning the full amount was there.

18.  CW also later reported that GIRALDO told CW that GIRALDO was worried because he had seen a brown Mercedes with dark windows (i.e. the surveillance agent's car). GIRALDO said that he had checked the license plate with a friend from the State Police and had been told that the car was an FBI car. (I believe that GIRALDO has in the past cooperated with the State Police in criminal investigations.)

19.  On March 25, 2004, CW had a consensually recorded conversation with VASQUEZ in which VASQUEZ told CW that GIRALDO (whom she referred to as "JUAN") believed that CW's customer was an undercover agent. CW assured VASQUEZ that the customer was not an undercover agent, and VASQUEZ suggested that CW let GIRALDO get a look at the customer to reassure himself.

20.  Based upon the foregoing, and based upon my training

and experience, there is probable cause to believe that JUAN GIRALDO and CLARA VASQUEZ have knowingly and intentionally conspired with each other and with others to distribute and to possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of 21 United States Code, Sections 846, 841(a)(1) & 841(b)(1)(B).

I, having signed this affidavit under oath, as to all assertions and allegations contained herein, state that its contents are true and correct to the best of my knowledge, information and belief.

_____
JAMES J. MCCORMACK
Special Agent
Drug Enforcement Administration

Sworn to before me on this 8th day of June, 2004.

_____
CHARLES B. SWARTWOOD, III
UNITED STATES MAGISTRATE JUDGE